UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ON NET,<br><br>              Plaintiff,<br><br>      v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>              Defendant. | No. 1:19-cv-00756-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

I.      <u>**Introduction**</u>

Plaintiff On Net ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income (SSI) pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 16, 20 and 21.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 8 and 9.

## II.   Procedural Background

On March 31, 2015, Plaintiff filed an application for supplemental security income alleging disability beginning December 12, 2013.  AR 15.  The Commissioner denied the application initially on August 3, 2015, and following reconsideration on January 29, 2016.  AR 15.

On March 22, 2016, Plaintiff filed a request for a hearing.  AR 15.  Administrative Law Judge Shiva Bozarth presided over an administrative hearing on April 12, 2018.  AR 30-57.  Plaintiff, who was represented by an attorney, appeared and testified through an interpreter.  AR 30, 32.  On July 18, 2018, the ALJ denied Plaintiff's application.  AR 15-25.

The Appeals Council denied review on March 21, 2019.  AR 1-6.  On May 28, 2019, Plaintiff filed a complaint in this Court.  Doc. 1.

## III.   Factual Background

### A.  Plaintiff's Testimony

Plaintiff (born 1966) immigrated to the United States from Cambodia in 1985.  She speaks only Khmer.  AR 220.  Plaintiff never received any schooling in the United States.  AR 36.  She never worked outside her home in the United States, but stayed home to care for her eight children.  AR 36.

When Plaintiff applied for disability she was unable to care for her youngest daughter, who was autistic.  AR 207.  An older daughter had assumed the care of the autistic child.  AR 207.  By the time of the agency hearing only the youngest daughter was still a minor.  AR 37.  In addition, Plaintiff's husband and four adult children lived in the family's home.  AR 37, 161-62.  Plaintiff prepared an evening meal but did not prepare breakfast or lunch.  AR 37-38.  She herself ate only once a day because she had little appetite.  AR 49.  Plaintiff also had difficulty sleeping.  AR 49.  She had little energy.  AR 49-50.

Plaintiff did not clean the house, testifying that she was unable to hold a broom.  AR 38.  Since she became sick Plaintiff stopped going to temple.  AR 38.  She could not work with other people stating, "I cannot work in a place where there were people because when I stand, I feel dizzy, and I feel like falling down."  AR 39.  Plaintiff found relief in going outside and listening

1  to Buddhist prayers.  AR 43, 46.  Plaintiff experienced back pain and would lie down a total of

2  two hours daily.  AR 47.

3       Plaintiff's memory had always been poor.  AR 38-39.  Two or three times weekly she

4  experienced a visual hallucination of a purple face of a person from her past, frequently her dead

5  son or her late father.  AR 43-45.  When the hallucination ended Plaintiff was tearful and missed

6  her son.  AR 44.  Asked whether her medication reduced the number or frequency of her

7  hallucinations Plaintiff stated, "There's no medication that can help me stop seeing these things

8  because I still think about my child."  AR 46.  Plaintiff's medications caused side effects of

9  "bloody vision" and dizziness.  AR 47.  Plaintiff did not like to talk to her therapists, but went to

10  the appointments to keep getting the medicine.[2]  AR 48.

11       Questioned by her attorney, Plaintiff explained that she did not like to be at home with her

12  family, specifically her children and grandchildren.  AR 41.  Plaintiff experienced angry outbursts

13  because her family members drove her crazy and did not listen to her.  AR 42.  Her family made

14  her feel bad and made her to want to kill herself.  AR 42.  Her medications effectively calmed her

15  down.  AR 41.  Plaintiff did not experience anger issues with people outside her family.  AR 42.

16       Plaintiff only bathed every two or three days because she could not breath in the shower.

17  AR 48.  She did not monitor her own blood pressure but took her medication daily.  AR 48.

18       With the help of her adult son Augustine Pheng, Plaintiff submitted an adult function

19  report in May 2015.  AR 206-14.  Plaintiff claimed disability alleging that: (1) her high blood

20  pressure rendered her too weak to carry anything; (2) low vision impaired her ability to see; and,

21  (3) the recent death of her son rendered her depressed, confused, and unable to eat or sleep.  AR

22  206.  Plaintiff sometimes felt dizzy when she walked.  AR 207.  Her impairments affected all

23  physical activities except sitting.  AR 211.

24       Plaintiff was able to feed herself and use the toilet independently, but experienced

25  weakness that limited her ability to dress herself and care for her hair, and breathing problems

26  that kept her from bathing.  AR 207.  Her daughter helped Plaintiff remember to take her

27
28  [2] The administrative record includes no evidence indicating that Plaintiff received psychotherapy.  As detailed below, psychiatrists at Fresno County Behavioral Health (FCBH) managed Plaintiff's mental health prescriptions beginning in 2016.

medications.  AR 208.  Plaintiff prepared meals but sometimes the food was not cooked properly.  AR 208.

Plaintiff shopped five times monthly for food and home supplies.  AR 209.  She was unable to pay bills, make change or prepare checks or money orders.  AR 209.  She enjoyed movies, gardening and listening to monks chanting.  AR 210.  Plaintiff and her family attended temple services twice yearly.  AR 210.

Augustine Pheng prepared a third party adult function report that did not differ substantially from Plaintiff's report.  AR 192-200.  However, he noted that Plaintiff was taking poor care of herself as evidenced by her neglecting hair care and infrequent bathing and changing clothes.  AR 193.  Mr. Pheng also reported that his sister Hana had assumed care of their youngest sister when Plaintiff could not provide adequate care.  AR 193.  Plaintiff had lost interest in life since the death of her youngest son.  AR 198.

### B.    Medical Records

On three occasions in Spring 2013, Plaintiff received medical care from Hing B. Luong, M.D., whose treatment notes appear at AR 267-70.  Dr. Luong treated Plaintiff's hypertension and hyperlipidemia.  AR 267.  The doctor repeatedly noted Plaintiff's poor medical compliance.[3]  AR 267-68.  In June 2013, Plaintiff declined a referral to a gynecologist for spotting following a miscarriage.  AR 269.

From April 2015 to November 2017, Dr. Luong again provided Plaintiff's medical treatment.  AR 315-34.  In addition to acute symptoms such as upper respiratory symptoms, the doctor diagnosed and treated osteoarthritis, hypertension and hyperlipidemia but saw no indications of cardiovascular symptoms.  AR 315-34.  Dr. Luong continued to note that Plaintiff failed to adhere to treatment and did not take her medications as prescribed.  AR 315-34.  Plaintiff's blood work indicated a number of abnormalities in addition to hyperlipidemia, including iron deficiency anemia and deficiencies of vitamins D and B-12.  AR 324-30.

---

[3] At each of the three 2013 appointments for which notes were included in the record, Dr. Luong noted that Plaintiff had been without medication for prolonged periods.  Although the Court cannot make a finding concerning the earliest appointment in the absence of earlier records, at the two later appointments, each of which occurred one month after the prior appointment, Dr. Luong noted that Plaintiff had been without medication for the past month.  This suggests that Plaintiff did not fill her prescriptions following the appointments.

From May 2016 to January 2018, Plaintiff received medication management for depression, anxiety and post-traumatic stress syndrome from Fresno County Behavioral Health (FCBH).  AR 336-76.  In May 2016, Plaintiff appeared for her intake interview wearing "pajama like clothing," disheveled and with uncombed hair.  AR 373.  She was accompanied by an interpreter.[4]  AR 373.  She made little eye contact.  AR 373.  Plaintiff reported that she was functioning so poorly that her adult daughters were caring for the house and the two youngest children.  AR 373. Symptoms included sadness, tears, low motivation, low energy, low appetite, poor memory and irritability.  AR 373.  Plaintiff reported mood swings, worry, racing thoughts, shakiness, dizziness, and auditory and visual hallucinations.  AR 373.  Plaintiff denied prior mental health treatment or hospitalization.  AR 374.  The initial diagnosis was major depressive disorder with psychotic features.  AR 376.

In August 2017, Plaintiff was treated for headache, chest pain,[5] shortness of breath and dizziness in the emergency department of Community Regional Medical Center.[6]  AR 378-405.  Harold E. Lowder, M.D., noted that Plaintiff's hemoglobin level was 7.8.[7]  AR 378.  Plaintiff's headache was likely attributable to her noncompliance with hypertension and other medications.  AR 381, 389.  An angiogram indicated cholelithiasis (gallstone), an ectatic (enlarged) ascending aorta but no central pulmonary embolism.  AR 380.

The physical examination was generally normal with appropriate psychiatric affect, normal gait and station, and normal range of motion.  AR 382-83, 385-87.  Plaintiff's discharge diagnosis was chest pain, anemia, hypertension, hyperlipidemia and schizoaffective disorder.  AR

///

---

[4] Although one of Plaintiff's children accompanied her to her other medical appointments to act as translator, in this case Plaintiff was accompanied by a translator hired from a local interpreting agency.  AR 373.  The record does not explain the significance of Plaintiff's using a professional interpreter in this instance.

[5] Plaintiff's chest pain subsided before an ambulance arrived to take her to the hospital.  AR 380.  Plaintiff sought to leave the hospital upon arrival.  AR 386.

[6] Upon admission, Plaintiff reported a history of diabetes and schizophrenia.  AR 394-95.  The record includes no evidence to support her statements.

[7] Hemoglobin (Hb) is the protein contained in red blood cells that is responsible for delivery of oxygen to the tissues.  To ensure adequate tissue oxygenation, a sufficient hemoglobin level must be maintained. The amount of hemoglobin in whole blood is expressed in grams per deciliter (g/dl). The normal Hb level for females is 12 to 16 g/dl. When the hemoglobin level is low, the patient has anemia, resulting in generalized weakness and fatigue.  Henny H. Billett, *Clinical Methods: The History, Physical, and Laboratory Examinations*, 3d ed. (Butterworth's 1990) (reproduced at ncbi.nlm.nih.gov/books/NBK259/ (accessed September 1, 2020)).

1  379.  Plaintiff was directed to follow up with Dr. Luong and to consult a gynecologist since she

2  attributed her anemia to heavy menstrual periods.  AR 383.

3      In October 2017, CRMC emergency personnel treated Plaintiff for complaints of

4  generalized weakness.  AR 406-07.  Plaintiff's diagnosis was anemia and general malaise.  AR

5  406.

6          **C.**    **Medical Opinions**

7              **1.  Agency Physicians**

8      The agency secured the consultative examinations discussed below to supplement

9  Plaintiff's limited medical records.  AR 64.  On initial review, agency physician E. Trias, M.D.,

10  noted that despite Plaintiff's allegations of hypertension, heart problems and right-sided

11  numbness, the consultative physical examination was generally normal except for hypertension.

12  AR 64.  In light of Plaintiff's robust activities of daily living, Dr. Trias found the consultative

13  opinion overly restrictive and opined that Plaintiff's hypertension was not severe.  AR 64. The

14  doctor also found Plaintiff's statements concerning her symptoms to be only partially credible

15  since the symptoms were not fully supported by the objective evidence of record.  AR 66.

16      Agency psychologist Heather Barrons, Psy.D., observed that the record indicated no

17  evidence of mental health treatment before the June 2015 death of Plaintiff' ten-year-old son.  AR

18  65.  Dr. Barrons observed that sorrow and bereavement were a socially appropriate response to

19  the loss of a child and not an occupational impairment.  AR 65.

20      On reconsideration psychologist R. Liss, Ph.D., and L. Bobba, M.D., agreed with the

21  initial opinions that Plaintiff's alleged impairments were not severe.  AR 76-77.

22              **2.  Cardiology Consultation: Dr. Poonia**

23      In June 2015, at the request of the state agency, Mohinder S. Poonia, M.D., examined and

24  evaluated Plaintiff for cardiology disability. AR 271-73.  The exam was intended to evaluate

25  Plaintiff's alleged chest palpitations, blurry vision, and leg and arm pain.  AR 271.  Plaintiff

26  complained of dizziness and occasional blurring of vision.  AR 271.  She denied history of

27  persistent cough, fever, hemoptysis (coughing of blood), loss of weight, loss of appetite,

28  hematemesis (vomiting blood), melena (bloody stools), or chronic urinary or bowel disorders.

AR 271.  She was taking no medications.  AR 271.  The examination was normal in all respects.

AR 271-72.  Dr. Poonia opined that further evaluation of Plaintiff's reported palpitations would

require an echocardiographic examination and possible 24-hour Holter monitor recording.[8]  AR

272.

### 3.    Consultative Psychiatric Examination: Dr. Michiel

In June 2015, psychiatrist Ekram Michiel, M.D., performed a consultative examination of

Plaintiff, who complained of depression.  AR 276-79.  Plaintiff had been depressed since her ten-

year-old son had died of a brain tumor several months before the examination.  AR 276.  She had

no past psychiatric hospitalization or mental health care.  AR 276.  Plaintiff was fairly groomed,

casually dressed and displayed adequate personal hygiene.  AR 277.

Plaintiff maintained eye contact and displayed normal speech and body movement.  AR

277.  She denied suicidal or homicidal ideation, hallucination and illusion.  AR 277.  Her thought

content was not delusional, and her thought process was goal-directed.  AR 277.  She was

oriented and performed adequately on the mini mental health assessment.  AR 278.  Dr. Michiel

diagnosed:

Axis I:       Uncomplicated bereavement.

Axis II:      Deferred.

Axis III:     High blood pressure and high cholesterol.

Axis IV:      Stressors: Health condition; social; loss of her son in February 2015.

Axis V:       Global Assessment of Functioning:  55.

AR 278.[9]

In Dr. Michiel's opinion, Plaintiff was able to maintain attention and concentration to

carry out simple job instructions; to relate and interact with coworkers, supervisors and the

general public; and, to handle her own funds.  AR 278-79.  She was unable to carry out an

---

[8] The administrative record includes no evidence that Plaintiff ever underwent the recommended testing.

[9] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 51-60 corresponds to moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*

extensive variety of technical and/or complex instructions.  AR 278.  Activities of daily living were not limited.  AR 278.

### 4.      Internal Medicine Consultation: Dr. Raju

In July 2015, family physician Lakshmanaraju Raju, M.D., examined Plaintiff and prepared a consultative internal medicine evaluation.  AR 282-87.  Plaintiff complained of headaches, chest tightness, shortness of breath, cough and low back pain.  AR 282.  Dr. Raju found that Plaintiff's blood pressure was elevated and directed her to go to her personal physician or an emergency department as soon as possible.  AR 284.  In all other regards, the examination was within normal limits.  AR 284-86.  Dr. Raju diagnosed systemic hypertension; history of palpations and dyspnea, pending further assessment; dyslipidemia, treated with diet and medication; low back pain by history; and, bereavement, depression with anxiety resulting from the recent death of Plaintiff's ten-year-old son. AR 286.  Plaintiff had no suicidal or homicidal ideations.  AR 286.

In Dr. Raju's opinion, Plaintiff could walk four hours in an eight-hour workday with breaks as needed; sit six hours in an eight-hour workday with breaks as needed; lift and carry twenty pounds occasionally and ten pounds frequently; and, perform postural activities subject to her symptoms of dyspnea and chest palpations and tightness.  AR 287.  Plaintiff was able to perform workplace environmental activities under supervision with due consideration for her symptoms of dyspnea, and chest palpations and tightness.  AR 287.  The doctor recommended that the agency pursue Dr. Poonia's recommendations for additional cardiac testing.  AR 287.

### 5.      Internal Medicine Consultation: Dr. Chukwu

In September 2017, internist Uzoma Chukwu, M.D., conducted a second consultative examination.  AR 290-300.  Plaintiff complained of low back pain, hypertension, heart problems and right-sided numbness.  AR 290.  According to Plaintiff her back pain began in 1999 when she fell at home.  AR 290.  She also reported headaches, dizziness and vision changes.  AR 291.

Plaintiff appeared weak and anxious.  AR 291.  She was able to walk from the waiting room to the examining room without assistance; sit comfortably; remove her flip-flops and put them on; bend to pick up an object from the floor; and get on and off the examining table without

1  difficulty.  AR 291.  Her vision was 20/70 bilaterally without correction, and 20/70 left and 20/50

2  right with lenses.[10]  AR 291.  The physical examination was generally normal except for a

3  positive straight-leg-raising test.  AR291-93.  Dr. Chukwu diagnosed post- traumatic back pain

4  with no significant change in the range of motion of the spine; rule out coronary artery disease;

5  and, hypertensive disorder, well controlled on medications.  AR 293.

6  The doctor opined that Plaintiff could stand six hours in an eight-hour workday with no

7  limitations on sitting.  AR 293.  She could lift and carry fifty pounds occasionally and 25 pounds

8  frequently.  AR 294.  Plaintiff could frequently climb stairs but never climb ladders, ropes or

9  scaffolds.  AR 294.  Manipulative and other postural activities were not limited.  AR 294.  She

10  should be protected from workplace hazards including unprotected heights.  AR 294.

11  **6.      Psychological Consultation: Dr. Livesay**

12  Psychologist Jerry R. Livesay, Ph.D., conducted a mental evaluation in September 2017.

13  AR 305-13.  The doctor observed that Plaintiff sat quietly with a sad expression and no eye

14  contact.  AR 308.  She appeared detached and preoccupied with internal stimuli, engaging in

15  some subvocalizations.  AR 308.  She walked slowly with a drooping gait.  AR 308.

16  Plaintiff told Dr. Livesay that her depression dated to her family's capture by the Khmer

17  Rouge in Cambodia when she was ten years old.  AR 308.  The family was separated and sent to

18  different work camps.  AR 308.  Plaintiff escaped and was chased by the Communists but

19  managed to get another family member freed through trickery.  AR 309.  She witnessed much

20  violence when the Viet Cong invaded Cambodia to overthrow the Khmer Rouge.  AR 309.

21  Thereafter, Plaintiff was troubled with vivid traumatic nightmares, anxiety and depression.  AR

22  309.  She continues to have bad dreams that interfere with her sleep.  AR 310.  Some years before

23  Dr. Livesay's examination, Plaintiff had been hospitalized for two days because of suicidal

24  ideation and gestures.  AR 309.  Later, she attempted suicide by overdosing on pills.  AR 312.

25  She reported a family history of mental illness and told Dr. Livesay that she got no support from

26  her family because they too had mental problems.  AR 310, 312.

27  ///

28  _____
[10] The record does not indicate whether Plaintiff had glasses or contact lenses to correct her vision.

1   Plaintiff completed the equivalent of seventh grade in Cambodia,  AR 309.  She lived with

2   her husband and eight children with whom she had a positive relationship.  AR 309.  She had

3   tried to work on and off over the years until her depression worsened ten years before.  AR 309.

4   Plaintiff could not recall her previous jobs nor how long she was employed.  AR 309.

5   On a typical day, Plaintiff awoke between 8:00 and 9:00 a.m. and ate a breakfast prepared

6   by a family member.  AR 310.  She sometimes ate only a single meal a day because she did not

7   feel well and could not eat.  AR 310.  She did no housework.  AR 310.  When she shopped she

8   accompanied her husband but stayed in the car while her husband shopped.  AR 310.

9   Plaintiff had arrived at the appointment wearing a wool hat.  AR 308.  In the course of the

10   examination Plaintiff removed the hat revealing a crudely and unevenly shaved head.  AR 310.

11   Plaintiff told Dr. Livesay that her scalp itched and burned and that electricity ran through her

12   head.  AR 310.

13   According to Dr. Livesay, Plaintiff's attempts to evince a positive attitude and to speak

14   were interrupted by her symptoms.  AR 311.  Her speech was sluggish and not goal-directed.  AR

15   311.  Thought content centered on feelings of hopelessness, helplessness and worthlessness.  AR

16   311.  Plaintiff recounted auditory hallucinations of family members screaming during torture, and

17   of the voices of family members from the past speaking to her.  AR 312.  AR 311, 312.  She

18   reported visual hallucinations of being covered by a giant shadow.  AR 311.

19   Plaintiff performed poorly on the various items within the mini mental status examination.

20   AR 311-312. She was unable to concentrate but instead focused on her symptoms, particularly

21   her itchy head and her hair falling out.  AR 312.  She told the doctor, "It feels like there is

22   something wrong with my head."  AR 312.

23   Plaintiff did not mention her son's death until the end of the interview when she told the

24   doctor that her favorite child had died in 2015.  AR 313.  Plaintiff then became tearful, expressed

25   guilt and indicated a belief that she was a curse on her family.  AR 313.

26   Dr. Livesay diagnosed major depressive disorder, moderate-severe, with mood congruent

27   psychotic features and anxious distress, and post- traumatic stress disorder with delayed

28   ///

10

expression.  AR 313.  He opined that Plaintiff was treatable and was likely to show measurable improvement in the next twelve months with evidence-based treatment.  AR 313.

Dr. Livesay accepted her family's representation that Plaintiff was unable to handle money on her own behalf.  AR 313.  He opined that Plaintiff was moderately impaired in her ability to perform detailed and complex tasks; interact with co-workers and the public; perform work activities on a consistent basis without special or additional instruction; maintain regular attendance and complete a normal workday and workweek without interruption from psychiatric symptoms; and, deal with the usual stress encountered in the workplace.  AR 313.  Her ability to perform simple and repetitive tasks was mildly impaired.  AR 313.  Her ability to accept instructions from supervisors was unimpaired.  AR 313.

## IV.   **Standard of Review**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was

///

11

1   inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d

2   1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

3   **V.     The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must
> establish that he or she is unable to engage in substantial gainful
> activity due to a medically determinable physical or mental
> impairment that has lasted or can be expected to last for a continuous
> period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A).
> An individual shall be considered to have a disability only if . . . his
> physical or mental impairment or impairments are of such severity
> that he is not only unable to do his previous work, but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established

a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§

416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding

that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in

substantial gainful activity during the period of alleged disability, (2) whether the claimant had

medically determinable "severe impairments," (3) whether these impairments meet or are

medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P,

Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to

perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs

existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

**VI.     Summary of the ALJ's Decision**

The Administrative Law Judge found that Plaintiff had not engaged in substantial gainful

activity since March 31, 2015, the application date. AR 17. Her severe impairments included

major depressive disorder with psychotic features; post traumatic stress disorder; hypertension;

and hyperlipidemia. AR 17. None of the severe impairments met or medically equaled one of

the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d),

416.925 and 416.926).  AR 18.

The ALJ concluded that Plaintiff had the residual functional capacity to perform a full range of medium work as defined in 20 C.F.R. § 416.967(c).  AR 19.  Plaintiff could lift and carry fifty pounds occasionally and 25 pounds frequently; stand and walk six hours in an eight-hour workday; and, sit at least six hours in an eight-hour workday.  AR 19.  Plaintiff could never climb ladders, ropes or scaffolds, or be exposed to unprotected heights or moving machinery.  AR 19, Plaintiff could frequently balance, stoop, crawl, kneel or crouch, and climb ramps and stairs.  AR 19.  She needed to learn tasks by visual demonstration.  AR 18.

Plaintiff had no past relevant work.  AR 24.  However, considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs available in significant numbers in the national economy that Plaintiff could perform.  AR 24.  Accordingly, the ALJ found that Plaintiff was not disabled at any time from the application date of March 31, 2015, through July 18, 2018, the date of the decision.  AR 25.

**VII.   The ALJ Properly Assessed the Reliability of Plaintiff's Testimony**

Plaintiff contends that the ALJ erred in rejecting Plaintiff's testimony concerning her pain, symptoms and limitations.  The Commissioner disagrees, correctly noting the numerous inconsistencies between Plaintiff's testimony and the medical record.

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  His or her findings of fact must be supported by "clear and convincing evidence."  *Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014).

To determine whether the ALJ's findings are supported by sufficient evidence a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  "[A] federal court's review of Social Security determinations is quite limited."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).  "For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the

1    opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting

2    *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014), quoting *Consolo v.*

3    *Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)) (internal quotation marks omitted).  Federal courts

4    should generally "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony,

5    and resolve ambiguities in the record.'"  *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler*, 775

6    F.3d at 1098).  In this case, the ALJ relied on inconsistencies between the testimony and objective

7    evidence that was without support in the record as a whole and in the ALJ's own findings.

8        Social Security Ruling 16-3p applies to disability applications heard by the agency on or

9    after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that

10   subjective symptom evaluation is not "an examination of an individual's character" but an

11   endeavor to "determine how symptoms limit ability to perform work-related activities."  S.S.R.

12   16-3p at 1-2.

13       An ALJ performs a two-step analysis to determine whether a claimant's testimony

14   regarding subjective pain or symptoms is credible.  *See Garrison v. Colvin*, 759 F.3d 995, 1014

15   (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); S.S.R 16-3p at 3.  First, the

16   claimant must produce objective medical evidence of an impairment that could reasonably be

17   expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014;

18   *Smolen*, 80 F.3d at 1281-1282.  In this case, the first step is satisfied by the ALJ's finding that

19   Plaintiff's "medically determinable impairments could reasonably be expected to produce the

20   alleged symptoms."  AR 20.  The ALJ did not find Plaintiff to be malingering.

21       If the claimant satisfies the first step and there is no evidence of malingering, the ALJ

22   must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent

23   to which the symptoms limit an individual's ability to perform work-related activities."  S.S.R.

24   16-3p at 2.  "[S]ome individuals may experience symptoms differently and may be limited by

25   symptoms to a greater or lesser extent than other individuals with the same medical impairments,

26   the same objective medical evidence and the same non-medical evidence."  S.S.R. 16-3p at 5.  In

27   reaching a conclusion, the ALJ must examine the record as a whole, including objective medical

28   evidence; the claimant's representations of the intensity, persistence and limiting effects of his

1   symptoms; statements and other information from medical providers and other third parties; and,

2   any other relevant evidence included in the individual's administrative record.  S.S.R. 16-3p at 5.

3   "The determination or decision must contain specific reasons for the weight given to the

4   individual's symptoms, be consistent with and supported by the evidence, and be clearly

5   articulated so the individual and any subsequent reviewer can assess how the adjudicator

6   evaluated the individual's symptoms."  S.S.R. 16-3p at *10.

7          In this case, the ALJ's analysis was within this prescribed legal framework. The ALJ

8   began the analysis by summarizing Plaintiff's testimony about her physical and mental

9   impairments and their effect on her activities of daily living.  AR 19-20.  The ALJ found

10  Plaintiff's statements about the intensity, persistence, and limiting effects of [her] symptoms not

11  to be fully consistent with the medical evidence of record.  AR 20.  The ALJ then considered each

12  of the many medical expert opinions in this case in light of the objective medical records along

13  with Plaintiff's representations of her activities of daily living and her perceptions of her own

14  limitations.  AR 20-24.  Finally, the ALJ considered Augustine Pheng's third-party adult function

15  report, giving it some weight but finding that it did not evidence any greater limitations than the

16  other evidence in the record as a whole.

17         Plaintiff contends that the ALJ's analysis failed to provide specific examples of Plaintiff's

18  testimony countered by clear and convincing reasons for rejecting that testimony.  However, no

19  precedent requires an ALJ to compile a list of a claimant's allegation with each item offset by

20  countervailing reasons in order to determine that the claimant's testimony was unreliable.  In this

21  case the ALJ's analysis proceeded exactly as intended, summarizing Plaintiff's testimony and the

22  evidence in the record as a whole, then weighing the various opinions and objective evidence to

23  determine Plaintiff's physical and mental ability to perform jobs existing in significant numbers at

24  the national and regional level.  20 C.F.R. § 416.920(a)-(f).

25         It is true that an "ALJ may not simply reject the claimant's statements regarding her

26  limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*,

27  242 F.3d 1144, 1147-48 (2001) (quoting *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989)).  A

28  "claimant's subjective statements may tell of greater limitations than can medical evidence

alone." *Id. See also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* (internal quotation marks and citations omitted).

The law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of the analysis of the record as a whole, an ALJ properly considers whether the objective medical evidence supports or is consistent with a claimant's symptom testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence"). "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." S.S.R. 16-3p at 6. Because objective medical evidence may reveal the intensity, persistence and limiting effects of a claimant's symptoms, an ALJ must consider whether the symptoms reported by a claimant are consistent with medical signs and laboratory findings of record. *Id.* For example, "reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, pain." *Id.*

A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair*,

1  885 F.2d at 603.

2       The hearing decision sets forth abundant evidence in the record to support the ALJ's

3  determination that Plaintiff's representations concerning her physical and mental symptoms were

4  not fully reliable.

5       **VIII.  The ALJ Appropriately Identified Jobs That Plaintiff Could Perform**

6       Plaintiff contends that the ALJ erred in accepting the vocational expert's testimony that

7  Plaintiff was able to perform the exemplary jobs of conveyor feeder off bearer (DOT No.

8  921.686-014), laboratory equipment cleaner (DOT No. 381.687-018) and industrial cleaner (DOT

9  No. 381.687-018).  She adds that the hearing decision finding that Plaintiff was able to

10  communicate in English was not supported by any evidence in the record.  The Commissioner

11  disagrees contending that the ALJ properly relied on the vocational expert's testimony.

12       **A.  The Hearing Testimony**

13       Jose L. Chaparro testified as the vocational expert.  AR 50-55.  Before considering the

14  ALJ's hypothetical questions, Mr. Chaparro stated that his testimony would be consistent with the

15  Dictionary of Occupational Titles (DOT) and associated publications, and that if he were to

16  deviate from the DOT he would identify the deviation and explain the reason for the deviation.

17  AR 51.

18       For the first hypothetical question, the ALJ directed Mr. Chaparro to assume an individual

19  of the same age, education and work experience as Plaintiff.  The hypothetical individual could

20  lift and carry 50 pounds occasionally and 25 pounds frequently; sit for at least six hours in an

21  eight-hour workday; stand or walk for at least six hours in an eight-hour workday; never climb

22  ladders, ropes or scaffolds; frequently climb ramps and stairs, balance, stoop, crouch, kneel or

23  crawl; and, never be exposed to heights or fast moving machinery.  AR 52.  The hypothetical

24  individual was limited to simple and routine tasks; occasional contact with supervisors, coworkers

25  and the general public; and, able to learn tasks by visual demonstration.  AR 52.  (This

26  hypothetical individual had the same residual functional capacity as that ultimately determined

27  for Plaintiff.)

28       Mr. Chaparro testified that work was available for the exemplary person.  AR 52.  He

identified the following exemplary positions: conveyor feeder-offbearer (DOT No. 921.686-014),

laboratory equipment cleaner (DOT No. 381.687-018) and industrial cleaner (DOT No. 381.687-

018).  AR 52-53.

Following a second hypothetical question posed by the ALJ, Plaintiff's attorney

questioned the vocational expert concerning the availability of jobs if the hypothetical person

were to be off task 15 percent of the workday, or to require additional breaks in the course of an

eight-hour workday.  AR 53-54.  Mr. Chaparro then addressed the differences between the DOT

and his testimony, based on his training, education, experience and access to professional

research:

> The DOT does not address—it's not part of the DOT definition in
> other words, off-task time, extra breaks, absences, those kinds of
> things.  The DOT does not also address the need for extra reminders
> and that kind of thing.  The DO[T]—as far as visual demonstration,
> the DOT does not really define that for us.  For SVP 1, it just says
> simple demonstration, but as far as visual demonstration, the jobs
> that I propose are all simple. They can easily be performed that way,
> and again that's based on my knowledge and experience and
> education and so on.  Lastly, your honor, the DOT, when it comes to
> climbing, does not differentiate between ladders, stairs, and anything
> else that is climbed. So, it doesn't differentiate those.  Between those.
> And that's it.

AR 54-55.

## B.   The ALJ's Determination Meets the Applicable Legal Standard

In determining whether appropriate jobs exist for a claimant, an ALJ generally will refer

to the DOT, which sets forth "detailed physical requirements for a variety of jobs."  *Light v.*

*Social Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997).  An ALJ must take judicial notice of

reliable job information available from various governmental and other publications, including

the DOT.  20 C.F.R. § 416.966(d); SSR 00-4p at *2.  The DOT is the primary source of

"information about the requirements of work in the national economy."  SSR 00-4p at *2.  In

addition, the agency may use the services of a vocational expert or other specialist to assist in

determining a complex issue, such as whether a claimant's job skills can be used in a specific

occupation.  20 C.F.R. § 416.966(e); SSR 00-4p at *2.

Social Security Ruling 00-4p is intended, among other things, to clarify standards for the

1   use of vocational experts in administrative hearings.  SSR 00-4p at *1.  By identifying the DOT

2   as the primary source of information, the ruling contemplates that the ALJ will be familiar (or

3   will familiarize herself) with the provisions of the DOT applicable to the claim being considered.

4   SSR 00-4p at *2.  Vocational experts are intended to assist in resolving complex questions,

5   generally by testifying at administrative hearings.  *Id.*

6          The DOT "is not the sole source of admissible information concerning jobs."  *Johnson v.*

7   *Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995) (quoting *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir.

8   1994)).  An ALJ "may take administrative notice of any reliable job information, including  . . .

9   the services of a vocational expert." *Johnson*, 60 F.3d at 1435.  An ALJ is "within his rights to

10  rely solely on the vocational expert's testimony. The Social Security regulations do not require the

11  Secretary or the expert to rely on classifications in the *Dictionary of Occupational Titles.*"  *Id.*

12  (quoting *Conn v. Secretary of Health and Human Services,* 51 F.3d 607, 610 (6th Cir.1995)).

13  In *Conn,* although the expert described certain jobs as sedentary which the DOT classified as light

14  or medium, the court held that "the ALJ may rely on the testimony of the vocational expert even

15  if it is inconsistent with the job descriptions set forth in the *Dictionary.*" *Id.*

16         An ALJ can only properly rely on testimony inconsistent with the DOT after he or she has

17  determined both whether the VE has deviated from the DOT and whether any deviation is

18  reasonable.  *Massachi v. Astrue*, 486 F.3d 1149, 1152-54 (9th Cir. 2007).  Reasonable deviations

19  may include occupations for which the DOT does not provide information but for which

20  information is available elsewhere and occupations for which the general information in the DOT

21  does not apply in the specific situation.  *Id.* at 1153 n. 17.   Evidence sufficient to support a

22  deviation from the DOT may consist either of specific findings of fact regarding a claimant's

23  ability to perform particular jobs or of inferences drawn from the context of the expert's

24  testimony.  *See Johnson*, 60 F.3d at 1435 n. 7 (ALJ provided sufficient support for deviation by

25  noting that the vocational expert described characteristics and requirements of jobs in the local

26  area consistent with claimant's residual functional capacity); *Terry v. Sullivan*, 903 F.2d 1273,

27  ///

28  1279 (9th Cir. 1990) (ALJ may infer support for deviation where vocational expert's

understanding of applicable legal standards is clear from context).

Because the ALJ conducting the administrative hearing in *Massachi* did not ask the vocational expert whether her testimony conflicted with the DOT, the expert never acknowledged a conflict and the ALJ never determined whether there was a reasonable explanation for the conflict.  486 F.3d at 1153-54.  Conversely the ALJ in this case directed the vocational expert to identify any deviations from the DOT and explain the basis for each deviation.  At the close of his testimony Mr. Chaparro identified the deviations as well as his testimony concerning matters not included within the DOT but familiar to Mr. Chaparro as a result of his education and experience.

The Ninth Circuit does not expect an ALJ to conduct an independent review of a DOT listing to determine whether he or she must question a vocational expert in detail about a potential conflict.  "[N]ot all potential conflicts between an expert's job suitability recommendation and the *Dictionary's* listing of 'maximum requirements' for an occupation will be apparent or obvious . . . . . an ALJ need only follow up on those that are."  *Gutierrez v. Colvin*, 844 F.3d 804, 807-08 (9th Cir. 2016).  The decision explained:

> For a difference between an expert's testimony and the *Dictionary's* listings to be fairly characterized as a conflict, it must be obvious or apparent.  This means that the testimony must be at odds with the *Dictionary's* listing of job requirements that are essential, integral, or expected.  This is not to say that ALJs are free to disregard the *Dictionary's* definitions or take them with a grain of salt—they aren't.  But tasks that aren't essential, integral or expected parts of a job are less likely to qualify as apparent conflicts that the ALJ must ask about.  Likewise, where the job itself is a familiar one—like cashiering—less scrutiny by the ALJ is required.

*Gutierrez*, 844 F.3d at 808.

For example, although Mrs. Gutierrez had weight bearing and overhead reaching limitations of her right arm, but full use of her left arm, the vocational expert opined that she could work as a cashier.  *Id.*  The DOT provides generally that cashiering involves frequent reaching.  *Id.*  "While 'reaching' connotes the ability to extend one's hands and arms 'in any direction,' SSR 85-15 . . . at *7 . . ., not every job that involves reaching requires the ability to reach overhead."  *Id.*  Although the DOT specifies that both cashier and stock clerk jobs require frequent reaching, the court contrasted the work performed by stock clerks who frequently

1    reached overhead to stock shelves, with the reaching performed by a cashier, who almost never

2    has to reach overhead. *Id.* Observing that the work of cashiers is commonly known, the

3    Gutierrez court concluded that an ALJ has no obligation to ask specific questions where common

4    experience indicates that a task is unlikely and unforeseeable. *Id.* In such instances, an ALJ is

5    entitled to rely on the expert's experience in job placement to account for the requirements of a

6    particular job. *Id.* at 809. *See also Lamear v. Barryhill*, 865 F.3d 1201, 1205 (9th Cir. 2017)

7    (factually distinguishing Mr. Lamear's case from that of Mrs. Gutierrez, finding that common

8    experience was not sufficient to conclude that an individual with Mr. Lamear's specific

9    limitations in handling, fingering and feeling could perform the job duties described in the DOT

10   descriptions).

11       The Ninth Circuit has also applied *Gutierrez* in a series of unpublished cases which

12   illustrate the fact-dependent nature of an ALJ's duty to inquire. In the absence of obvious or

13   apparent conflict an ALJ is entitled to rely on an expert's specific testimony that a claimant with

14   the ability to perform a limited range of work could perform the exemplary jobs. *Towne v.*

15   *Berryhill*, 717 Fed.Appx. 705 (9th Cir. 2017). Notably, the court has determined that there was no

16   need for an ALJ to investigate and resolve an apparent conflict where the claimant's limited

17   English language abilities were not essential, integral or expected for the job of sewing machine

18   operator. *Ruiz v. Berryhill*, 732 Fed.Appx. 592 (9th Cir. 2018). In this case, the ALJ

19   appropriately concluded that Plaintiff could perform either of the identified cleaning jobs or a job

20   loading or unloading a conveyor belt despite her inability to communicate in English.

21                **C.  Plaintiff Failed to Raise Issue Below**

22       In any event, this issue is not properly before this Court because Plaintiff did not raise this

23   issue below. When a claimant is represented by counsel, as Plaintiff was in this case, she must

24   raise all issues and evidence in the administrative hearing to preserve them for appeal. *Meanel v.*

25   *Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999). Failure to comply with this rule is excused only in

26   cases of manifest injustice, which is not present in Plaintiff's case. *Id.*

27   ///

28   ///

### D. Harmless Error

Finally, in footnote 2 (Doc. 16 at 25). Plaintiff contends that the ALJ erred in finding, against uncontradicted evidence to the contrary, that Plaintiff was "able to communicate in English."  Indeed, the hearing decision erroneously found that "The claimant is illiterate and is able to communicate in English" (20 CFR 416.964).  AR 24.  Whether the error is analytical or typographical, the finding is error.  But because the error did not change the ultimate determination of whether or not Plaintiff was disabled, it is harmless.

An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). Although paragraph 7 of the hearing decision states that Plaintiff was able to communicate in English, Plaintiff's residual functional capacity acknowledged her language limitation and specified that Plaintiff "must be able to learn tasks by visual demonstration."  AR 19.  In identifying exemplary jobs that Plaintiff could perform, the vocational expert's testimony accommodated Plaintiff's inability to speak English.  Thus, even if the ALJ had not erred at paragraph 7, the outcome of the hearing decision would not be different.

A "court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti*, 533 F.3d at 1038 (citations and internal quotation marks omitted).

### IX. Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff On Net.

IT IS SO ORDERED.

Dated:   __September 11, 2020__                   _____ **/s/ Gary S. Austin**
                                                   UNITED STATES MAGISTRATE JUDGE